IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

RENEE GIFFIN,

        Plaintiff,

    v.

PROVIDER SERVICES,
INC.,

        Defendant.

Case No. 2:10-CV-144
JUDGE SARGUS
MAGISTRATE JUDGE KING

## OPINION AND ORDER

This matter is before the Court for consideration of Defendant's Motion for Summary Judgment (Doc. 25) and Motion to Strike Plaintiff's Affidavit (Doc. 30). For the reasons set forth herein, Defendant's motion to strike is **GRANTED in PART** and Defendant's motion for summary judgment is **GRANTED in PART and DENIED in PART**.

### I.

Plaintiff Renee Giffin ("Giffin") brings claims against Defendant Provider Services, Inc. ("Provider Services"), her former employer, for disability discrimination, retaliation, and violation of her rights under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.* Giffin's claims for discrimination and retaliation arise under Ohio law.

### A.

Provider Services is in the business of owning and operating nursing homes. On March 1, 2006, it purchased and began operating the McGraw Nursing Home, where Giffin was employed as administrator. (*See* Giffin Dep. 13.) She had worked at the McGraw Nursing home since 1992, and had been administrator since approximately 2004. (Giffin Dep. 13, 18.) After the purchase, the facility was renamed the Sienna Pointe Rehabilitation Center ("Sienna Pointe").

(Giffin Dep. 24.) Giffin continued in her position as administrator of the facility until she resigned in June 2006. (Pl.'s Mot. Summ. J. Ex. B.) The parties dispute the circumstances surrounding her resignation, with Giffin claiming that she was forced to resign because of a knee injury, and Provider Services claiming that Giffin voluntarily resigned in lieu of being subjected to a performance improvement plan.

Giffin recalls first learning of the impending purchase in February 2006, during a meeting with Oscar Jarnicki, McGraw's owner. (Giffin Dep. 28–29.) She also recalls meeting with Kevin Daubenmire ("Daubenmire"), an employee of Provider Services who would later oversee operations of Sienna Pointe, and another employee of Provider Services before the ownership transition occurred on March 1st. (Giffin Dep. 30.) At the time of the ownership transition, Provider Services required all of the current employees of the McGraw Nursing Home to complete employment applications and be interviewed. (Giffin Dep. 37–38.) After it began operating the facility, Provider Services determined that Sienna Pointe was overstaffed, and, according to Giffin, she worked with Daubenmire to determine the employees who would be retained and employees who would be terminated. (Giffin Dep. 39–40.)

Giffin's notes record a meeting on March 28, 2006 that she attended with Daubenmire. They discussed the operation of Sienna Pointe using Provider Services' operational formulae. (Giffin Dep. 54–55.) According to Giffin, Daubenmire wanted staffing changes to be made as quickly as possible, but also understood that changes would take some time. (Giffin Dep. 55–56.) Giffin described Daubenmire's attitude at this meeting as positive and encouraging. (Giffin Dep. 56.) In early April, Daubenmire indicated some concerns about the facility's décor and furnishings. (Giffin Dep. 60.) In mid-April, Giffin's notes reflect that she was asked by Daubenmire to assist him with a similar ownership transition at the Bell Nursing Home. (Giffin

Dep. 62.)  According to Giffin, her role at the Bell home involved talking to the staff and the administrator, and doing "just whatever was needed."  (Giffin Dep. 63.)

Giffin had torn the anterior cruciate ligament of her right knee while skiing on March 25, 2006.  (*See* Giffin Dep. 73.)  On May 25th, she had surgery to repair her knee, and between the date of her injury and the date of the surgery, she was able to walk "slowly."  (Giffin Dep. 76.)  On May 14th, she notified Daubenmire that she would need to miss at least two weeks of work following the surgery, and her request for leave was approved by Daubenmire.  (Giffin Dep. 77–78.)  Giffin experienced some complications following the surgery, and did not return to work until June 19th, the day she resigned.  (Giffin Dep. 95.)  At the time of her return, her doctor had restricted her as to running, jumping, squatting, kneeling, and "excessive stairs" for six weeks.  (Giffin Dep. 92.)  Giffin testified that, upon her return, she walked slowly, but "could still get around," and had no limitations on her ability to work.  (Giffin Dep. 96–97.)  She did not formally request FMLA leave and was paid for the time she was absent from work following the surgery.  (Giffin Dep. 83, 87.)

Daubenmire testified at his deposition that prior to the June 19th meeting at which Giffin's employment with Provider Services ended, he had several verbal counseling sessions with Giffin concerning her performance in the months prior to her resignation.  (*See* Daubenmire Dep. 7, 8.)  These counseling sessions involved discussions about the application of Provider Services' operational formulae, quality and cleanliness in the dietary department, the therapy department, and staffing and leadership issues.  (Daubenmire Dep. 6, 8, 15, 18–19.)  According to Daubenmire, he had scheduled the June 19th meeting with Giffin to initiate a formal performance improvement plan to address some of the ongoing issues at Sienna Pointe.  (Daubenmire Dep. 33.)  Daubenmire stated that, at the meeting, he told Giffin "that I knew she

was trying, but the process and the facility was not improving." (Daubenmire Dep. 33.) Specific issues addressed by Daubenmire at this meeting included the dietary department, Giffin's leadership, therapy, and nursing. (Daubenmire Dep. 35.) According to Daubenmire, he informed Giffin that if the performance improvement plan were not completed successfully in thirty days, it could lead to her termination, and, that if she did not want to sign a performance improvement plan, he would accept her resignation and offer her a severance package. (Daubenmire Dep. 34.) Giffin then asked him to put his severance offer in writing, Daubenmire drafted a handwritten resignation letter, and Giffin signed the letter. (*See* Daubenmire Dep. 34–37.) Daubenmire stated that no performance improvement plan was ever drafted because Giffin indicated that she would not accept one. (Daubenmire Dep. 36.)

Provider Services' human resources director Daniel Cobb also attended the June 19th meeting. According to him, problems with Giffin's job performance that necessitated the implementation of a performance improvement plan included "census issues at the building, issues of sanitation at the building, overall leadership, and general administrator operator-type of things that were deficient." (Cobb Dep. 6.) Cobb testified that no performance issues were ever documented in writing in Giffin's personnel file. (Cobb Dep. 8–9.) Cobb corroborated Daubenmire's testimony that, at the meeting, Giffin had been given the option of agreeing to a performance improvement plan, but instead opted to resign. (Cobb Dep. 16–17.)

Giffin's version of the June 19th meeting differs substantially from that of Cobb and Daubenmire. According to her, the only deficiencies in her performance discussed during the meeting regarded the cleanliness of the kitchen. (Giffin Dep. 102.) She denies that a performance improvement plan was ever mentioned or offered to her at the meeting, but instead testified that Daubenmire wrote out the resignation letter and insisted that she sign it, telling her

4

that she "had to sign it or [her] reputation was on the line in the community." (Giffin Dep. 103.)

The next day, Giffin attempted to rescind her resignation, but Daubenmire refused to allow her to

do so. (Giffin Dep. 109–110.) When questioned as to why she believed Provider Services

forced her to resign her position because she had taken leave after her surgery, Giffin testified as

follows:

> Because I don't have any other reason. I don't have any kind of written
> information brought out. They weren't able to write anything on a piece of paper
> to tell me something I did wrong. I don't have any other, you know—I don't
> know why. I guess I never had a clear understanding of why there was—why
> they needed me to resign.
> Q. Because you don't know of any other reason that, in your mind, justifies it, you
> think it must be connected to the fact that you took the leave?
> A. No. I believe that has to be why.
> Q. Because you don't know why else they would do it?
> A. No. Just because they weren't really wanting to—You know, I was willing to
> come back and do my job and that didn't happen. That because of my injury, I no
> longer had a position. That, you know, I was dragging them down or not able to
> keep up or—I'm not sure what they were thinking. I'm not reading their mind.
> Q. Did anyone at Provider Services ever say or do anything that led you to
> conclude they thought you were letting them down or not keeping up because of
> your knee?
> A. Not to my face.

(Giffin Dep. 122–23.)

The deposition testimony of Debra Jackson, a subordinate and friend of Giffin, somewhat

contradicts Giffin's version of events. For instance, Jackson testified that Giffin told her that

Giffin had resigned because she did not want to complete an "action plan." (Jackson Dep. 29.)

Jackson indicated that an action plan was the same as a performance improvement plan.

(Jackson Dep. 74.) According to Jackson, the ownership transition had been an overwhelming

time for Giffin. (Jackson Dep. 64.) Jackson also testified that Giffin never indicated to her that

Giffin had been forced to resign. (Jackson Dep. 69.)

5

At her deposition, Giffin testified that since leaving Provider Services, there have been no limitations on her ability to walk or work caused by her knee injury. (Giffin Dep. 112.) She has not required physical therapy since August 2006. (Giffin Dep. 113.) Prior to her surgery, she also claimed that a knee immobilizer caused her to drag her foot. (Giffin Dep. 125–26.) On the day of her return to work post-surgery, she was able to walk slowly, but required breaks after short amounts of time. (Giffin Dep. 127.) She claims to have been in a lot of pain and to have been limited in her ability to walk "for a while." (Giffin Dep. 128.)

Giffin has also submitted an affidavit dated August 13, 2010 (her deposition was conducted on February 5, 2010). In the affidavit, Giffin avers that as a result of her knee injury, she does not have full flexibility in her leg and experiences numbness. (Giffin Aff. ¶ 8.) She further avers that she is limited in the number of steps she can take, walks up and down steps with caution, that her knee aches when the weather changes, and that she is afraid to ski. (Giffin Aff. ¶¶ 8, 10.) However, Giffin claims to exercise every day and indicates that she is able to perform lunge exercises, although with greater difficulty than before the injury. (Giffin Aff. ¶ 8.) In the affidavit, Giffin also states that her knee somewhat interferes with her work as a nursing teacher. (Giffin Aff. ¶ 13.) Giffin concludes the affidavit with the following statement:

> The injury marked a watershed in the treatment that I got from representatives of Provider Services, particularly [Daubenmire], my immediate supervisor
>
> (a)     It was prior to the injury to my knee, which occurred while skiing, and the limitations that occurred prior to surgery. Prior to the injury, I was asked if I wanted to take over as administrator of a new facility that Provider Services was then planning to build in Barnesville, regarding which he told me would be a good chance to start with a new facility, e.g. including working with the contractor, and which he told me would be a good opportunity for me; I was told what a good job I was doing; was given a $500 bonus; speaking to employees at Bell, which was a new facility and said to me that Daubenmire respected my leadership abilities. At other times I went to Bell with Daubenmire to look at the equipment they had.

(b)     After my injury, the treatment was different in that I received no such positive treatment from representatives of Provider Services.

(Giffin Aff. ¶ 14.)

**B.**

Giffin initially filed this action in the Court of Common Pleas of Belmont County bringing only claims under state law.  However, she subsequently amended her complaint to include her claim under the FMLA, and Provider Services opted to remove the case to this Court (Doc. 2).  Provider Services now moves to strike Giffin's affidavit and for summary judgment on all claims.

**II.**

Before addressing Provider Services' motion for summary judgment, the Court first considers its motion to strike Giffin's affidavit.  According to Provider Services, Giffin is attempting to use the affidavit to impermissibly create material issues of fact, and thus avoid summary judgment.  "A party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony." *Reid v. Sears, Roebuck and Co.*, 790 F.2d 453, 460 (6th Cir. 1986).  In *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899 (6th Cir. 2006), the Sixth Circuit established the following paradigm for determining whether post-deposition affidavits can be considered on motions for summary judgment:

> a district court . . . must first determine whether the affidavit directly contradicts the nonmoving party's prior sworn testimony. A directly contradictory affidavit should be stricken unless the party opposing summary judgment provides a persuasive justification for the contradiction. If, on the other hand, there is no direct contradiction, then the district court should not strike or disregard that affidavit unless the court determines that the affidavit constitutes an attempt to create a sham fact issue.

*Id.* at 908 (internal quotations and citations omitted).  Possible justifications for contradictory affidavits include if the witness was confused at the deposition and the affidavit explains the confusion or in cases where evidence is discovered after a deposition is taken.  *Miller v. A.H. Robins Co.*, 766 F.2d 1102, 1104 (7th Cir. 1985).

In the analysis, *infra*, the Court will consider whether portions of the affidavit should be stricken on an instance by instance basis and as relevant to the particular claims under consideration.

### III.

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993).  To avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *accord Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993).  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59

(1970); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (stating that the court must draw all reasonable inferences in favor of the nonmoving party and must refrain from making credibility determinations or weighing evidence). In responding to a motion for summary judgment, however, the nonmoving party "may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *see Celotex*, 477 U.S. at 324; *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994). Furthermore, the existence of a mere scintilla of evidence in support of the nonmoving party's position will not be sufficient; there must be evidence on which the jury reasonably could find for the nonmoving party. *Anderson*, 477 U.S. at 251; *see Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Matsushita*, 475 U.S. at 587–88 (finding reliance upon mere allegations, conjecture, or implausible inferences to be insufficient to survive summary judgment).

## IV.

The Court will now consider whether Giffin has created issues of material fact for each of the four counts in the Amended Complaint. For the reasons stated below, the Court grants summary judgment to Provider Services as to Counts I through III, but denies summary judgment as to Count IV.

### A.

In Count I of her Amended Complaint, Giffin brings a claim for disability discrimination in violation of Ohio statutory law. The Ohio Revised Code provides that "[i]t shall be an unlawful discriminatory practice . . . [f]or any employer, because of the . . . disability . . . of any person . . . to refuse to hire, or otherwise to discriminate against that person with respect to hire,

9

tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." OHIO REV. CODE § 4112.02. Giffin contends that she was discriminated against by Provider Services because of an actual or, in the alternative, perceived disability.

**1.**

To establish a prima facie case of disability discrimination, a plaintiff must demonstrate that "(1) the [plaintiff] had a disability, (2) the defendant took an adverse employment action, at least in part, because the plaintiff had the disability, and (3) the [plaintiff], while having a disability, could safely and substantially perform the essential functions of the job in question." *Wallace v. Mantych Metalworking*, 937 N.E.2d 177, 183 (Ohio Ct. App. 2010). Provider Services contends that Giffin has failed to create a material issue of fact as to whether she is disabled. Giffin responds by asserting that a reasonable jury could conclude that she is in fact disabled or was regarded by Provider Services as being disabled, and that she can otherwise establish the remaining elements of a prima facie case of disability discrimination.

The term "disability" is defined by the Ohio Revised Code as

a physical or mental impairment that substantially limits one or more major life activities, including the functions of caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working; a record of a physical or mental impairment; or being regarded as having a physical or mental impairment.

*Id.* § 4112.01(A)(13). Because of the similarity between the Ohio disability discrimination statute and the federal Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), Ohio courts look to regulations and cases interpreting the ADA for guidance in interpreting the Ohio statute. *City of Columbus Civil Serv. Comm'n v. McGlone*, 697 N.E.2d 204, 206–07 (Ohio 1998). The term "substantially limits" is not defined in the Ohio Revised Code or Ohio

Administrative Code, but is defined by federal regulations to mean "unable to perform a major life activity that the average person in the general population can perform" or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1).[1]

In determining whether an individual is substantially limited as to a major life activity, the "[t]he nature and severity of the impairment," "[t]he duration or expected duration of the impairment," and "[t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment" should be considered. *Id.* § 1630.2(j)(2). *See also Canady v. Rekau & Rekau, Inc.*, No. 09AP-32, 2009 WL 3021764, at *8 (Ohio Ct. App. Sept. 22, 2009). "Generally, short-term, temporary restrictions are not substantially limiting." *Roush v. Weastec, Inc.*, 96 F.3d 840, 843 (6th Cir. 1996). Rather, "an impairment generally must be 'permanent or long-term.'" *Novak v. MetroHealth Med. Ctr.*, 503 F.3d 572, 582 (6th Cir. 2007) (quoting *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 198 (2002)). As stated below, even when viewing the evidence in a light most favorable to Giffin, the Court concludes that she has failed to create an issue of material fact as to whether she is actually disabled.

Provider Services asserts that Giffin's knee injury temporarily limited her ability to walk or work, but that the limitations were never substantial and were not permanent. Giffin, however, contends that the following evidence establishes that she is disabled: 1) her knee has

---

[1] The Court does not consider what effect, if any, the ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 ("ADAAA"), may have on Ohio disability discrimination law as the events that are the subject of this lawsuit occurred prior to the January 1, 2009 effective date of the ADAAA and the ADAAA does not apply retroactively. *Milholland v. Sumner County Bd. of Educ.*, 569 F.3d 562, 565 (6th Cir. 2009). Accordingly, the Court will apply law interpreting the ADA prior to the passage of the ADAAA to the facts of this case.

never regained its full flexibility; 2) she experiences numbness in her leg; 3) the injury limits the number of steps she can safely traverse; 4) the leg aches when the weather changes; 5) she "notices" the leg when she exercises; 6) she is unable to ski, and 7) she is limited in her ability to drive to business meetings.  As an initial matter, whether Giffin is able to ski is not relevant to the question of whether she is limited in her ability to walk.  Similarly, whether Giffin is able to drive to meetings is also irrelevant.

The remaining claimed limitations originate in Paragraph 8 of Giffin's affidavit. According to Provider Services, these averments directly contradict Giffin's prior deposition testimony and should be stricken.  The Court agrees, and finds that Paragraph 8, to the extent its averments go to the issue of whether Giffin's injury substantially limits her ability to walk, directly contradicts Giffin's deposition testimony concerning her ability to walk during the time since her employment with Provider Services ended.  When asked during her deposition whether, "[s]ince leaving Provider Services, have there been any limitations in your ability to walk caused by your knee condition," Giffin answered "no."  (Giffin Dep. 112.)  Giffin essentially argues that this statement should be considered in conjunction with her questioning by her counsel on pages 125 through 128 of the deposition, in which Giffin testified about her problems walking and the pain she was experiencing.  (*See* Giffin Dep. 125–28.)  However, in the Court's view, this testimony concerns the time period within the immediate aftermath of the surgery, whereas the direct question asked by counsel for Provider Services concerned the time period since Giffin left the company's employ, up to, and including, the present.  For instance, virtually all of the questions and answers during Giffin's examination by her counsel are framed in the past tense, e.g., "Q. You *were* limited? A. A little bit, yes, for a while."  (Giffin Dep. 128 (emphasis supplied).)

12

Additionally, Giffin has made no showing to explain or excuse the contradiction between her denial of any ongoing problems walking and the averments in Paragraph 8 of the affidavit. In this regard, nothing in the affidavit indicates that Giffin was confused by the question concerning her ability to walk. To the contrary, the question was direct and unambiguous. Thus, the Court is precluded from considering Paragraph 8 as part of the record, and accepts Giffin's testimony that she currently has no limitations on her ability to walk caused by her knee injury.

The remaining record reflects that Giffin suffered a knee injury that undoubtedly affected her ability to walk over a relatively brief period of time between the date she was injured and her rehabilitation following corrective surgery. However, the limitation on her ability to walk, even if it could be considered to have been substantial on a temporary basis, was not permanent or long-term, as Giffin admitted that the knee injury has not caused any limitations on her ability to walk in the time since she left Provider Services. Accordingly, Giffin's knee injury does not substantially impair her ability to walk, and no reasonable jury could find in her favor on the issue of whether she was actually disabled on this basis.

To the extent that Giffin is also asserting that she is disabled because she is substantially limited in her ability to work, her claim of actual disability must also fail for similar reasons. With regard to the major life activity of working, federal regulations provide that substantially limited means

> significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

29 C.F.R. § 1630.2(j)(3). During her deposition, Giffin indicated that her knee injury had not limited her ability to work in the time since her employment with Provider Services ended. (*See*

Giffin Dep. 112.) Consequently, the Court may not consider any averments in her affidavit that contradict this answer. Even if the Court were to consider the affidavit in its entirety, however, the record is simply lacking in any evidence that Giffin is restricted in her ability to perform a class or broad range of jobs. Accordingly, Giffin has failed to establish a disputed issue of material fact as to whether she actually is disabled under Ohio law.

**2.**

Giffin further contends that she is disabled under the Ohio statute because Provider Services regarded her as such. An individual can be disabled under the "regarded as" prong of the definition if "(1) [an employer] mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) [an employer] mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999). "'It is not enough [] that the employer regarded that individual as somehow disabled; rather, the plaintiff must show that the employer regarded the individual as disabled within the meaning of the ADA.'" *Ross v. Campbell Soup Co.*, 237 F.3d 701 (6th Cir. 2001) (quoting *Colwell v. Suffolk Cnty. Police Dep't*, 158 F.3d 635, 646 (2d Cir. 1998)). At issue then, is whether Provider Services mistakenly believed that Giffin's knee injury substantially limited her as to the major life activities of walking or working. Here, the record is also lacking as to any evidence that Provider Services perceived Giffin's knee injury as causing any such substantial limitations.

As stated *supra*, the record reflects that Giffin suffered a serious knee injury and was limited in her ability to walk and work for a period of time. Provider Services was undoubtedly aware of her injury. For instance, there is evidence that Daubenmire excused Giffin from making a long trip by car because of her leg. (*See* Daubenmire Dep. Ex. 9.) However, Giffin

14

has proffered no evidence to suggest that Provider Services considered the limitations on her ability to walk or work to be so substantial or permanent as to rise to the level of a disability under Ohio law. To the contrary, the record reflects that Giffin continued to work after the injury until her surgery, was asked by Daubenmire to assist at the Bell Nursing Home, and was able to do so. (*See* Daubenmire Dep. Ex. 9.) In her brief, Giffin cites many of the limitations she experienced between her injury and surgery as evidence of her perceived disability. However, under the "regarded as" prong of the definition of disability, the focus is on the employer's perception, and the record is simply bereft of evidence from which a reasonable jury could conclude that Provider Services regarded Giffin as being disabled within the meaning of the Ohio statute.

Summary judgment is granted to Provider Services as to Count I of the Amended Complaint because Giffin has failed to produce sufficient evidence for a reasonable jury to conclude that she is disabled or was regarded as disabled by Provider Services.

**B.**

Turning to Count II of the Amended Complaint, Provider Services is correct that Ohio law does not recognize public policy claims when there are already adequate statutory remedies available. *See Leininger v. Pioneer Nat'l Latex*, 875 N.E.2d 36, 42–43 (Ohio 2007). Here, Chapter 4112 of the Ohio Revised Code provides adequate remedies to plaintiffs who have been subject to discrimination based on disability. *See Berge v. Columbus Cmty. Cable Access*, 736 N.E.2d 517, 535 (Ohio Ct. App. 1999) ("Plaintiff's remedies under R.C. 4112.99 are sufficient to provide the complete relief required by *Kulch* [*v. Structural Fibers, Inc.*, 677 N.E.2d 308 (Ohio 1997)]."). Accordingly, summary judgment is granted to Provider Services as to Count II.

**C.**

Summary judgment is granted to Provider Services as to Count III of Giffin's Amended

Complaint, which alleges that Giffin was terminated in retaliation for engaging in protected

activities. Pursuant to § 4112.02 of the Ohio Revised Code, it is an unlawful discriminatory

practice

> [f]or any person to discriminate in any manner against any other person because
> that person has opposed any unlawful discriminatory practice defined in this
> section or because that person has made a charge, testified, assisted, or
> participated in any manner in any investigation, proceeding, or hearing under
> sections 4112.01 to 4112.07 of the Revised Code.

OHIO REV. CODE § 4112.02(I). Thus, the statute protects employees from discrimination based

on their opposition to unlawful discriminatory practices or based on their participation in

investigations, proceedings, and hearings. *See Motley v. Ohio Civil Rights Comm'n*, No. 07AP-

923, 2008 WL 2026426, at *2 (Ohio Ct. App. May 13, 2008).

Giffin, however, has not produced evidence that she engaged in activities protected by

the statute prior to her termination. Further, she admitted during her deposition that, during her

employment with Provider Services, she had never lodged any complaints about illegal

discrimination or participated in any investigations of illegal discrimination. (*See* Giffin Dep.

121.) Accordingly, as Giffin has not produced evidence from which a jury could reasonably

conclude that she engaged in activity protected by the Ohio antidiscrimination statute, summary

judgment is granted to Provider Services as to Count III of the Amended Complaint.

**D.**

Count IV of Giffin's Amended Complaint alleges a violation of the FMLA, which

requires employers to provide eligible employees up to a total of twelve workweeks of leave

annually if "a serious health condition [] makes the employee unable to perform the functions of

the position of such employee." 29 U.S.C. § 2612(a)(1)(D). It is unlawful for employers to either interfere with the rights afforded employees by the FMLA or retaliate against employees for exercising their FMLA rights. 29 U.S.C. § 2615(a). Giffin's brief appears to assert both interference and retaliation theories of recovery. Accordingly, the Court will address both.

### 1.

In order to prevail on her interference claim, Giffin must establish the following five elements:

> (1) she was an eligible employee, (2) the defendant was an employer as defined under the FMLA, (3) she was entitled to leave under the FMLA, (4) she gave the employer notice of her intention to take leave, and (5) the employer denied the employee FMLA benefits to which she was entitled.

*Edgar v. JAC Products, Inc.*, 443 F.3d 501, 507 (6th Cir. 2006). While the first three elements are likely met in this case, the record is lacking evidence that Giffin was denied FMLA benefits to which she was entitled. Rather, the undisputed facts are that Giffin asked for leave for her surgery and recuperation, and her request was granted.

### 2.

While an employer's motive or intent is not relevant to claims of FMLA interference, motive is an "integral" component of retaliation claims. *Edgar*, 443 F.3d at 507–08. To make out a prima facie case of retaliation, Giffin must demonstrate that "(1) she availed herself of a protected right under the FMLA by notifying [Provider Services] of her intent to take leave, (2) she suffered an adverse employment action, and (3) that there was a causal connection between the exercise of her rights under the FMLA and the adverse employment action." *Id.* at 508. A Plaintiff's burden in making out its prima facie case of retaliation "is not onerous" and is "easily met." *E.E.O.C. v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997) (citations omitted). If Giffin is able to make out a prima facie case, the burden then shifts to Provider Services to

17

articulate "a legitimate, nondiscriminatory rationale" for taking the adverse employment action. *Edgar*, 443 F.3d at 508. If Provider Services is able to do so, the burden shifts back to Giffin to demonstrate that Provider Services' proffered reasons are a pretext for unlawful discrimination. *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007). The ultimate burden of proof remains with Giffin. *See id.*

**a.**

For purposes of its motion for summary judgment, Provider Services concedes that Giffin availed herself of a protected right and suffered an adverse employment action. However, Provider Services contends that summary judgment must be granted to it as to Giffin's FMLA retaliation claim because she has not created a dispute of material fact as to whether there was a causal connection between the exercise of her protected rights and the adverse employment action. In order to establish a causal link, "a plaintiff is required to proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." *Avery Dennison Corp.*, 104 F.3d at 861 (internal quotations omitted). Giffin alleges that the close temporal proximity between her return to work and the meeting at which she was forced to resign is sufficient to create an inference that the adverse action was taken because of the protected activity.

On several occasions, the Sixth Circuit has struggled with the difficult issue of whether temporal proximity satisfies the plaintiff's burden of production. *See Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 596 (6th Cir. 2007) (claim for retaliation based on filing race discrimination complaint; "'temporal proximity itself is insufficient to find a causal connection'" (quoting *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 737 (6th Cir. 2006))); *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 321 (6th Cir. 2007) (claim of retaliation based on filing

of age discrimination complaint; "The law is clear that temporal proximity, standing alone, is insufficient to establish a causal connection for a retaliation claim."). *But see Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th 2004) (three month period between adverse action and protected activity enough to establish causation); *DiCarlo v. Potter*, 358 F.3d 408, 421–22 (6th Cir. 2004) (twenty-one day period between protected activity and adverse employment action deemed sufficient to establish causation; "this Circuit has embraced the premise that in certain distinct cases where the temporal proximity between the protected activity and the adverse employment action is acutely near in time, that close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise"); *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 314 (6th Cir. 2001) ("the proximity in time (five weeks) between Skrjanc's request for leave and his discharge constitutes indirect evidence of a causal connection between his exercise of a right under the FMLA and the adverse employment decision").

In *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516 (6th 2008), the Sixth Circuit attempted to reconcile its earlier cases addressing the issue of temporal proximity. The Court held that:

> Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation. But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.

*Id.* at 525. Stated slightly differently, "the more time that elapses between the protected activity and the adverse employment action, the more the plaintiff must supplement his claim" with other evidence. *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir. 2010).

19

While Giffin contends that the time period at issue consists only of the few hours between her return to work on June 19, 2006, and her resignation on that same day, Provider Services is correct that the applicable time period commenced at the point where it first *learned* of the protected activity. *Mickey*, 516 F.3d at 526. According to Giffin, she first notified Daubenmire that she would require time off because of the surgery on May 14th, five weeks before her resignation. Thus, the Court must determine if the five week period between the time when Provider Services learned of Giffin's need to take leave and her resignation is sufficient evidence from which a jury could infer causation. In answering this query in the affirmative, the Court first notes that the burden on Giffin in establishing her prima facie case is not an onerous one. Further, because the *Mickey* panel did not expressly define the phrase "very close in time," the Court is compelled to rely on time periods that have been held sufficient by the Sixth Circuit. Specifically, the Court looks to *Skrjanc*, another case involving FMLA retaliation. There, the Sixth Circuit accepted that an approximately five week time period between Skrjanc's request for FMLA leave and his discharge was sufficient to establish causation. *Skrjanc*, 272 F.3d at 314. Finally, as discussed in Part IV.D.2.c *infra*, in construing the evidence in Giffin's favor, her retaliation claim is buttressed by relatively strong evidence of pretext. In the Court's view, this evidence cannot be ignored in considering whether Giffin has established her prima facie case. *See, e.g., Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978) ("The method suggested in [*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)] . . . was never intended to be rigid, mechanized, or ritualistic.")

As the time period at issue in *Skrjanc* is identical to that at issue in the present case and considering Giffin's relatively strong evidence of pretext, the Court holds that Giffin has met her burden of establishing a prima facie case of FMLA retaliation.

20

**b.**

The Court next considers whether Provider Services has articulated a legitimate, non-discriminatory rationale for accepting Giffin's resignation. The Court finds that it has done so. Daubenmire testified that Giffin was offered a choice between accepting the performance improvement plan and resignation because of problems with Giffin's leadership, sanitation issues in the dietary department, problems with nursing, and problems with therapy. (Daubenmire Dep. 35.) Cobb testified that it was his understanding that Giffin's performance deficiencies included "census issues at the building, issues of sanitation at the building, overall leadership, and general administrator operator-type of things that were deficient." (Cobb Dep. 6.) From the testimony of Cobb and Daubenmire, a reasonable jury could conclude that Provider Services had legitimate, non-discriminatory reasons for asking for Giffin's resignation.

**c.**

Finally, having determined that Giffin has created disputed issues of material fact as to a prima facie case of FMLA retaliation, and that Provider Services has demonstrated legitimate, non-discriminatory reasons for accepting Giffin's resignation, the Court next considers whether Giffin has offered evidence from which a reasonable jury could conclude that Provider Services' offered reasons are merely a pretext for retaliation. The Court finds that Giffin has done so.

At her deposition, Giffin testified that, during the June 19th meeting, the only basis given for her forced resignation was sanitation issues in the kitchen. When pressed further, the following exchange occurred: "Q. When comments were made about the dirty kitchen, how did you respond to that? A. It was things that had never been brought to my attention before. It was things that happened while I was away, so I would have no knowledge of knowing what had occurred." (Giffin Dep. 102.) Accepting as true Giffin's version of the June 19th meeting, as the

21

Court must do for purposes of deciding Provider Services' summary judgment motion, the sole reason Provider Services gave to Giffin for her forced resignation was the sanitation issue in the kitchen. Through the quoted testimony, Giffin asserts that the things for which she was allegedly being terminated occurred while she was on leave. From this, a reasonable jury could conclude that Giffin was not actually being terminated for the offered reason. A jury could reasonably conclude that an employer would not punish her for something over which she had no control, and that such a reason was arguably a pretext.

V.

For the forgoing reasons, Defendant's Motion for Summary Judgment (Doc. 25) is **GRANTED** as to Counts I through III of the Amended Complaint, and as to an interference theory under Count IV. The motion is **DENIED** as to a retaliation theory under Count IV. Defendant's Motion to Strike Plaintiff's Affidavit (Doc. 30), is **GRANTED in PART**.

**IT IS SO ORDERED**


_3 - 15 - 2011_
**DATED**

                                        **EDMUND A. SARGUS, JR.**
                                        **UNITED STATES DISTRICT JUDGE**